IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| MARK BITZAN and CASSANDRA ZENT, <br><br> Plaintiffs, <br><br> vs. <br><br> JERRY BARTRUFF, et al., <br><br> Defendants. | No. 4:15-cv-00219-JAJ-CFB <br><br><br> **ORDER** |

Plaintiffs Mark Bitzan, an inmate at the Iowa State Penitentiary ("ISP") and his mother, Cassandra Zent, a private citizen living in Casper, Wyoming, brought this action pro se under 42 U.S.C. § 1983, claiming that Defendants[1] in the Iowa Department of Corrections ("IDOC") violated their First Amendment and due process rights when prison officials refused to send mail relating to investing in marijuana distribution companies on behalf of Bitzan, or refused to deliver mail sent by Zent to Bitzan. Bitzan also claims prison officials retaliated against him for exercising his First Amendment rights, through threats of disciplinary action or interference with his mail, as a result of other litigation or potential claims he was pursuing against these Defendants. Defendants move for summary judgment, and Plaintiffs, now represented by counsel, resist. The Court rescinds the order referring this case for report and recommendation, and the Court grants the motion for summary judgment.

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine

---

[1]Plaintiffs stipulated to dismissal of Defendants Roberts, Schierbrock, and Johnson. (ECF 43-2, at 12). They are dismissed. *See* Fed. R. Civ. P. 41(a)(2).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of proving there is no genuine dispute of material fact lies with the moving party. *Davis v. Jefferson Hospital Ass'n*, 685 F.2d 875, 680 (8th Cir. 2012). On a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 525 (8th Cir. 2009). Once the moving party has made a sufficient showing, the burden shifts to the non-moving party to set forth specific facts that there is a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party must present evidence sufficient for a reasonable jury to return a verdict in its favor. *Patel v. U.S. Bureau of Prison*, 515 F.3d 807, 812 (8th Cir. 2008); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.   CLAIMS AND DEFENSES

Discerning the scope of the claims and defenses was made difficult by the parties' lack of organization, lack of index, incomplete table of contents to their appendices, lack of tabs, or failure to cite with specificity to the portions of the record they relied upon. It is not the Court's job to parse though hundreds of pages of material in hopes of stumbling across a fact that relates to a claim or defense. Additionally, the parties' references to material in the appendices are not always accurate, or are described in sweeping generalities, which required the court to closely examine the exhibits and material in the appendices in order to ascertain what the item referred to actually contained, or whether the reference was to an entirely different document. Plaintiffs filed a Statement of Material Facts (ECF 43-1), which is a response to Defendants' statement of facts, with the addition of certain allegations, rather than a separate statement of Additional Material Facts. Defendants did not respond to the additional facts which Plaintiffs included in their Statement of Material Facts, so those facts are deemed admitted pursuant to LR 56(d). Having pleadings appropriately identified would have enabled easier tracking of the source of certain information referred to in briefs.

2

Counsel are put on notice that such disorganization is not acceptable. Dispositive motions are designed to secure the just, speedy, and inexpensive determination of the action, not an exercise in throwing something against a wall and see what might stick. The same is true of the need to state claims that are clear, focused, and identify a particular Defendant's actions.

The Amended Complaint does not identify specific claims made against individual Defendants, but based on the Court's review of the Complaint and Amended Complaint, the parties and claims remaining are:

1.  First Amendment and Due Process claims by Bitzan, against all Defendants, relating to interference with Bitzan's outgoing mail to certain companies, and threats to Bitzan of disciplinary action if he does not stop seeking investment information from companies, or persists in sending memos to staff concerning the basis for denial of his outgoing mail. Bitzan claims he suffered money damages due to the lost opportunity to invest in certain stocks;

2.  First Amendment and Due Process claims by Bitzan and Zent, against all Defendants, relating to rejection of Zent's incoming mail to Bitzan, when she sent photocopies of information about companies to Bitzan. Zent claims that threats of disciplinary action against Bitzan has restricted her communications with him. Zent claims that she lost money by not investing in certain stocks due to the inability to get Bitzan's guidance on stock purchases;

3.  Bitzan and Zent also allege certain staff threatened them with retaliation (interference with other incoming mail, or disciplinary reports against Bitzan) due to their exercise of their First Amendment rights on the issue of stock purchases. For example, Zent claims that certain books or other media she purchased for Bitzen were not delivered, and that she spent money to photocopy sections of a book that was rejected; and

4.  Plaintiffs claim that they were retaliated against by all Defendants, through ongoing interference with their mail, due to their grievances and complaints to prison official relating to their First Amendment claims concerning Bitzan's attempt to contact jurors, and his correspondence to Zent on this issue. Plaintiffs' claim that rejection of the letters to jurors, and the disclosure to prosecutors of the letters to jurors, and refusal to send the outline of Bitzan's legal analysis on his post-conviction relief action to Zent was in retaliation by Defendants. Although this issue was assigned to the instant case in the Second Initial Review Order, both parties addressed it in *Bitzan v. Baldwin*, 4-15-186, and it will be ruled upon in that case.

Plaintiffs claim money damages in the expenses of sending and receiving mail that was rejected by ISP staff, compensatory damages for emotional distress, nominal damages, and punitive damages. Plaintiffs seek injunctive and declaratory relief, requesting that Bitzan be allowed to directly invest in stocks, or use his mother as his stockbroker, and that their mail or other correspondence with each other be delivered.

Defendants argue:

1.   Neither Plaintiffs' First Amendment rights were violated, as the IDOC and prison regulations relating to screening and rejecting mail are legitimately related to a government need, particularly as to correspondence regarding the manufacture or distribution of marijuana in any form, and there were no Due Process violations in application of the policies;

2.   Defendants did not retaliate against either Plaintiff for their exercise of First Amendment rights because all mail rejected was for a legitimate reason pursuant to a valid policy with appropriate due process;

3.   Bitzan does not have a constitutional right to have grievance resolved in his favor;

4.   Bitzan did not suffer any physical injury, so he is not entitled to money damages pursuant to 42 U. S. C. § 1997e(e); and

5.   Defendants are entitled to qualified immunity from claims of money damages, as their actions did not violate any constitutional rights of the Plaintiffs.

## III.   SUMMARY OF MATERIAL FACTS

The Court has painstakingly reviewed the record and summarizes the following relevant facts, viewing the record in the light most favorable to the nonmoving parties. The Court was required to spend hours closely scrutinizing the record to discern what actions by which Defendants were the subject of Plaintiffs' claims, and to interpret how the defenses raised applied to certain facts, because the parties have not clearly and concisely pled their case or referred to specific portions of the record. The claims relate to Bitzan's incoming mail from Zent, and his outgoing mail to certain companies, and ongoing handling of Bitzan's mail at ISP:

## A.   Issues related to outgoing mail from Bitzan to five companies

The letters sent by Bitzan to five companies in January 2014 are identical, and state

4

that he is interested in learning more about each company, and investing with them.  The letters disclose that Bitzan does not have access to the Internet or email, and asks how "someone could make some potential investments [in your company] . . . ." Bitzan also asks if the company requires a minimum initial investment; whether the company has the capability for an investor to make direct investments; and whether an investment firm or broker is required, and if so, which one. Bitzan states that he is asking for information regarding how to invest with each company, "so I can determine whether it is even possible for someone in my situation to invest with you."  (ECF 32-3, pp. 77-84).

In none of the letters does Bitzan state he is seeking information on behalf of his parents or anyone else. There were no attachments to these letters.  The companies Bitzan wrote to are: Cannabis Sciences, Inc., San Diego, CA; Sionix Corp., Silver Springs, MD; Medical Marijuana, Inc., Colorado Springs, CO; Nuvilex, Inc., Houston, TX; and Silver Bull Resources, Inc., Vancouver, BC.

After a review of these letters by ISP mailroom staff, they were rejected, and returned to Bitzan, with an ISP form: "Notice of Rejection of Outgoing Correspondence," dated February 3, 2014.  This form contains a list of reasons these letters are deemed to be undeliverable; only one reason was selected on the form: "Other: attempt to violate institutional rules & involves subject matter that's illegal in Iowa." (ECF 32-3, p.76).  The form stated that the staff person responsible for this decision was N. Eaves.

Defendant VanWye, an Investigator at ISP, also reviewed the letters, and affirmed the decision to reject this correspondence.  In the course of making this decision, on January 30, 2014, Van Wye emailed Warden Ludwick and Rebecca Bowker to advise them of his decision to reject these letters, which he described as sent to "4 different legal marijuana distributors," because Bitzan was asking whether he would be able to invest with them.  In his email to Defendants Ludwick and Bowker, VanWye stated that he told mailroom staff to reject the letters, and return them to Bitzan, because VanWye believed that these letters violated the following prison disciplinary rules: 16(d): Unauthorized

5

possession/exchange; 34: Contracts, business; and 43: Attempt to conduct a business or form a contract. In this email VanWye indicated that he based his decision on the fact that in the letters Bitzan stated that he was the one making the investments, and does not state that he was seeking information for anyone else.  VanWye, in the email to Bowker and Ludwick, notes that he was advising them of this Notice of Rejection of Correspondence to Bitzan "in case you disagreed." (ECF 32-3 p. 85). There is nothing in the record as to any further response or discussion between VanWye and Ludwick or Bowker on the decision to reject Bitzan's outgoing mail to these companies.

The decision to reject these five letters resulted in a flurry of appeals, memos, O-mails,[2] and kites from Bitzan to various prison officials, most of whom are defendants in this action, and responses from officials: Bitzan first sent a series of Offender Memos, or kites, expanding upon his reasons for seeking information from these companies, and pointing out to staff that all the companies are publicly traded and it legal to own stock in them, and that only some of the companies were involved in distribution of medical marijuana in states where it is legal to do so.  These kites were addressed either to the Warden's Office, Business Office, or the Mail Room staff:

1.  On February 5, 2014, Bitzan sent thirteen separate kites, asking why information about cannabis is prohibited, if it is contained in information about publicly traded pharmaceutical companies that research medical marijuana, or serve cannabis dispensaries in states that have legalized the sale of marijuana. In various kites, Bitzan also asks whether inmates are prohibited from receiving any material that mentions marijuana; to be directed to any institutional rules relating to stock investments, stating that he cannot find any; states that he believes that inmates have due process and equal protection rights to unrestricted access to all public information; and requests a definition of "stock investment" and "business contract."

---

[2] "O-mail" stands for "Offender e-mail," the electronic system inmates use to communicate with friends and family.
https://doc.iowa.gov/offender-information/corrlinks-offender-e-mail (last accessed May 30, 2017).

In these kites, as part of his informal grievance resolution, Bitzan requested "to be allowed to purchase stocks," and that he be allowed to give his opinion to his parents concerning stocks "without fear of being written up." He also asserted that there is no legitimate penological interest in denying inmates the ability to purchase stocks, or simply correspond with companies to gather information. (ECF 32-2, pp. 100-103, 105-113).

On February 10, 2014, a staff member (name illegible) responded on two of the kites, noting that the definition of "stock investment" and "business contract" was not elaborated upon, or spelled out in the policies. (ECF 32-2, pp. 104, 114).

2.    On February 6, 2014, a staff member responded to these kites, noting that:  items legal in other states are not necessarily legal in Iowa;  pursuant to ISP Policy AD FM 11, inmates are limited to savings accounts and are not allowed to make investments; and Policy IO-RD-03 defines contracts and other rule violations. Bitzan was advised that "further attempts at interrogatories may result in a minor report." (ECF 32-3, p. 106).

3.    On February 7 and 10, 2014, Bitzan sent five kites to the Warden and staff, noting that he had appeals pending for the Notices of Rejection dated February 6 and 7 relating to incoming mail, for the three packets of photocopies of stock material sent from Zent. Bitzan states that this stock information was sent by Zent at his request, and that it all relates to legal companies approved for public trading by the SEC. Bitzan argues that there is no rational relationship to a governmental interest for denial of his receipt of information about stocks "just because it mentions cannabis."  Bitzan asks that the material not be destroyed. On February 20, 2014, mail room staff Eaves responded: "appeal noted." (ECF 32-3 pp. 89-91)

4.    On February 8, 2014, Bitzan sent a kite to the Warden's Office as further discussion in support of his informal resolution and appeal of the rejection of his outgoing and incoming mail relating to stocks. (ECF 32-2, pp. 92-96). In this five page memo, he expanded upon his reasons for sending the letters to the companies, and the need to received photocopies of information about the companies from his mother. Bitzan responded to the reasons for rejecting the correspondence provided in the Notices of Rejection, and expanded upon the reason he needed information from and about a variety of companies:

   a.    To provide an accurate opinion to his mother and father including accurate detail on the basis which these companies operate, not to operate a business himself, or assist his parents in doing so;

  b.  That material regarding companies that sell or are related to medical marijuana research or distribution should not be prohibited simply because it mentions cannabis, which by itself does not threaten the institutional order or security;

  c.  His plan for use of the information about the companies, whether received by mail from the companies directly, or indirectly through his mother, is so that he might provide his opinion to his mother and father about purchasing stock, with no expectation of anything in return. He denies that he has attempted to purchase anything, or send money anywhere;

5. On February 13, 2014, Bitzan filed an Offender Grievance Complaint relating to the denial of incoming and outgoing mail relating to stock investment. (ECF 32-3 pp. 98-99). Bitzan requested that he, personally, be allowed to purchase any stocks legally listed by the SEC and traded on the open market, and that he be allowed to give his parents his opinions concerning these stocks. Bitzan asserted his opinion that restrictions on his purchasing stocks, and maintaining the necessary financial accounts or relationship with a broker to effectuate this investment did not violate prison rules relating to entering in to contracts, conducting a business, or maintaining an approved savings account outside of ISP. Bitzan argued that since it is legal to purchase stock outside of prison, that ISP must allow this "product" to be made available for him to purchase while he is in prison. Bitzan requested that ISP provide him with a definition of "business contract."

On February 27, 2014, ISP Investigator Dave DeGrange noted that Bitzan's Grievance had been received, and would be processed, with a disposition within 21 days. (ECF 32-2 p 97). On February 28, 2014, DeGrange denied Bitzan's grievance, stating that the IDOC Rules #34 and #43 prohibit "this type of contract or business without the prior approval of the Warden."

6. On February 15, 2014, Bitzan appealed to IDOC Asst. Dir. Bartruff, the Warden's decision on the appeal of the Notice of Rejection of outgoing mail directed to stock companies. It is not clear from the record when the Warden issued a formal, rather than informal, decision relating to the appeal on the outgoing mail.

In this appeal, Bitzan stated that he was attempting to gather information so he could determine how to go about making investments. He asserted that there were no ISP rules restricting the collection of business information that was publicly available, and that the reason stated for rejecting the correspondence, as an "an attempt to violate institutional rules and involves subject matter that is illegal in Iowa" did not further a legitimate governmental interest. (ECF 32-3 pp 123-4).

On February 20, 2014, Sheryl Dahm responded to this appeal, stating that she had reviewed copies of Bitzan's outgoing correspondence (which he had provided with the appeal), and found that the Notice of Rejection of this outgoing mail was not in violation of his constitutional rights, as the IDOC Policy IO-OR-07 prohibits inmates from entering into contracts or agreements, incurring indebtedness, or engaging in business. (ECF 32-3, p.125).

7.     On February 23, 2014, Executive Officer Rebecca Bowker sent Bitzan an O-mail noting that she had reviewed his appeal regarding incoming correspondence from Zent (the photocopies of information about various companies). She stated that he was not allowed to purchase financial instruments "directly related to an illegal substance," and that further attempts to do so may subject him to discipline. No particular IDOC Policy was cited. (ECF 32-3 p.126).

8.     On February 26, 2014, Bitzan wrote to IDOC officials Bartruff and Dahm about the decision of the Warden relating to the incoming correspondence from Zent, which consisted of the three packets of photocopies of information about various companies. Bitzan requested clarification of any policy prohibiting him from receiving information about cannabis, or that contains the word cannabis. Bitzan stated that he was gathering information to provide an opinion to his mother and father about investing in certain companies. Bitzan requested that this mail be delivered to him. (ECF 32-3, p.127).

On March 4, 20014, Dahm responded to this letter, and stated that after checking with counsel, she stood by the opinion provided to Bitzan on February 20, 2014, that correspondence about investing, or attempts to direct investments implicated the rules prohibiting inmates from engaging in businesses, forming contracts or incurring indebtedness. (ECF 32-3, p. 128).

9.     On March 7, 2014, Bitzan appealed to the Warden the denial of his grievances relating to his outgoing and incoming mail. In the appeal, Bitzan requested that his mother be allowed to act as his stock broker, so that he may order her to make stock trades. Bitzan stated that it is his opinion that ordering stock trades through a broker is not considered to be the conduct of business, based upon his interpretation of certain prisoner's rights cases. Bitzan requested "to be allowed to order his stock 'broker' to make trades, whether immediate in real time, or contingent on price changes." (ECF 32-3, pp. 116-117).

In this grievance appeal, Bitzan further complained that prison officials actions in denying his incoming and outgoing mail, and threatening him with disciplinary

action regarding communications about stocks, for sending multiple kites pursuing this grievance, or preventing communication with his "broker," all violated his First Amendment rights, and deprived him of property, and violated his rights to due process.

10. On March 19, 2014, ISP Executive Officer Rebecca Bowker provided Bitzan with the Warden Appeal Response to his grievance, denying his appeal as to the outgoing and incoming mail, because Bitzan's attempts to invest in stocks, directly or using his mother as a "broker," would require him to enter into contracts, and would require a method of payment for trades, both of which are disciplinary rule violations. She noted that inmates conducting the type of business transactions requested by Bitzan would impact the security and order of the institution. (ECF 32-3, p.118- 119).

11. On March 20, 2014, Bitzan filed an appeal of his grievance relating to the responses to his series of thirteen kites sent February 5, 2014. He asked to be allowed to order his stock broker to make trades, in real time or contingent on price changes, without being threatened with disciplinary action or retaliation for doing so. He requested that his mother act as his stockbroker. He noted that the appeal of his prior grievance was answered by Bowker, who he claimed was the subject of that grievance, and asked that someone else consider this appeal. (ECF 32-3 pp. 120-212).

12. On March 26, 2014, IDOC Asst. Deputy Director Sheryl Dahm denied this grievance appeal (ECF 32-3, p. 122), referring Bitzan to IDOC Policy IO-OR-07, Section II which states: "It is the policy of the IDOC that offenders are not permitted to enter into a contract/agreement, incur indebtedness, or start or engage in a business or profession." (ECF 32-2-74).

## B. Issues relating to incoming mail from Cassie Zent to Mark Bitzan

Bitzan and Zent assert that their First Amendment rights have been violated because correspondence from Zent to Bitzan was rejected on February 6, 2014 by Defendant Phillips, ISP Mailroom staff. This correspondence consisted of three separate packets of information, copies of internet searches regarding the companies; there was no personal letter or information sent from Zent to Bitzan with the photocopies, although several of the pages have handwritten notes on them. (Plaintiffs' Appendix Ex. 5-8, ECF 43-4, pp. 1-50,

and 43-5, pp. 1-21).  Some of this photocopied information related to the five companies that Bitzan attempted to write to; these letters were rejected on February 3, 2014.  As Defendants did not respond to Plaintiffs' Statement of Facts, the Court finds that the information contained in these exhibits was the information reviewed by ISP mailroom staff.

The three packets of information reviewed, and rejected, by mailroom staff were:

*Packet 1*, consisting of photocopies of material printed from the Internet:

1.  Share Builder, no date, titled BMB Munai, Inc. (BMBM); $0.0065. There is a handwritten note listing an address for BMBM in Salt Lake City, UT, and stating "6 employees oil/energy."(ECF 43-3, p. 3).

2.  Share Builder, no date, MJNA Medical Marijuana, Inc.; $0.2585. a business description as "the first publicly held company vested in the medical marijuana and industrial hemp markets." (ECF 43-4, pp. 4 - 6).

3.  Undated Article about Medical Cannabis Payment Solutions Company (stock ticker symbol REFG), a "provider of integrated supply and distribution technology" that complies with requirements of states that have legalized medical marijuana. (ECF 43-4, pp. 7-10).

4.  Undated Article about Medical Greens, a subsidiary of SK3 Group, Inc. a "healthcare logistics and fulfillment consultancy" for delivery of alternative medicine. (ECF 43-4, pp. 11-12); press release dated January 24, 2014 announcing Medical Greens provides "focused door-to-door deliver of medical marijuana products to dispensaries across the state of California." (ECF 43-4, p. 18).

5.  Undated Nuvilex Inc. Stock profile from Yahoo! Finance (stock ticker symbol NVLX); $0.14.  (ECF 43-4, pp. 13-14).

6.  Undated Sionix Corp. profile from Yahoo! Finance and Share Builder (stock ticker symbol SINX); $0.0083.  (ECF 43-4, pp. 15-16).

7.  Undated Share Builder profile for Telkonet, Inc. (stock ticker symbol TKOI). Contains a handwritten notation of address in Milwaukee, WI, and note "computer/office equip 99 employees." (ECF 43-4, p. 17).

8.  Undated article regarding Silver Bull Resources, Inc., "a well-funded Canadian based mineral exploration company." There is a handwritten note: Midway Gold Stock" on each page. Four pages (ECF 43-4, pp. 19-22).

*Packet 2*, consisting of photocopies of material printed from the Internet:

1.  Undated stock profile from Yahoo! Finance and Stock Builder for SK3 Group, Inc. (Stock ticker symbol SKTO). $0.0279. (ECF 43-4, pp. 26-29).

2.      Undated stock profile from Share Builder for Hooper Holmes, Inc. $0.5130. (ECF 43-4, p. 31).

3.      Undated stock profile from Share Builder for Rapid Fire Marketing, Inc. (RFMK). $0.0016. There is a handwritten note: "Graph of 6 mos, graph is really light.' (ECF 43-4, p.32).

4.      Undated stock profile from Share Builder for RF Micro Devices, Inc. (RFMD). $5.33. (ECF 43-4, p. 33).

5.      Undated stock profile from Share Builder for Midway Gold Corp. (MDW), $1.04. ECF 43-4, p. 34).

6.      Undated stock profile from Share Builder for Cannabis Science, Inc. (CBIS). $0.1790. There is a handwritten note: "Graph of 3 mos barely shows up."

*Packet 3*, consisting of photocopies of material printed from the Internet:

1.      Undated Share Builder stock profile for Medical Marijuana, Inc. (MJNA), $0.3402. (ECFR 43-4, pp. 38-40).

2.      Undated report from businessweek.com for Bmb Munai, Inc (BMBM), $0.0075, stating that the company "does not have significant operations....[it] intends to identify and exploit new business opportunities. Previously, it was engaged in the exploration and production of natural gas properties in the Republic of Kazakhstan." (ECF 43-4, pp. 41-44).

3.      Undated reports from businessweek.com, and other sources for Telkonet, Inc. (TKOI), $0.26, stating that the company provides EcoSmart energy management technology and EthoStream high-speed internet access solutions. (ECF 43-4, pp. 45-46).

4.      Undated Share Builder reports for Medical Cannabis Payment Solutions (REFG), $0.2300; $0.2112, $0.2300. (ECF 43-4, pp. 47-50).

The Notice of Rejection of these three packets of Correspondence from Zent was sent to Bitzan on February 6, 2014, and stated that the reason for the rejection was: "(I): Item considered a threat to the institutional order and security, hand signs/gestures, threatens harm to any person/property, or threats/plans criminal activity; (M): Other: contents of cannabis not allowed." (ECF 32-3, pp. 86-88).

As Defendants have not responded to Plaintiffs' Statement of Facts, the Court finds that the material provided in Exhibit 8, which consists of copies of material from the internet in 2017, is considered, without further foundation, in support of Plaintiffs'

assertion that only two of the five letters Bitzan sent in 2014 were to companies connected with cannabis. ISP did not reject the information contained in Exhibit 8, because it was not mailed to Bitzan. Exhibit 8 consists of:

1. Report dated January 26, 2017, from Sionix.com about Sionix Corporation; it states that the company designs innovative and advanced mobile water treatment systems. (ECF 43-5, p. 2).
2. Report from AnnualReports.com dated January 26, 2017 about BMB Munai, Inc., noting that it does not have copies of Form 10K available, and the last archived Annual Report for this company was 2009. It describes BMB as an independent oil and gas company. (ECF 43-5, p. 3).
3. Undated report about Micron, a company with headquarters in Boise, ID described as a "global leader in the semiconductor industry." (ECF 43-5, pp. 4-5).
4. Report dated January 26, 2017, about PharmaCyte Biotech, Inc., stating it provides "novel therapies for cancer and diabetes built upon a platform technology: cancer, diabetes, cannabinoids; " and a Press Release dated January 7, 2015 stating that Nuvilex announces name change to PharmaCyte Biotech" with stock ticker symbol PHCB. (ECF 43-5, pp. 6-9).
5. Report dated January 26, 2017, from Nasdaq.com regarding RF Micro Devices, Inc. (RFMD), referencing the status as of 1997. (ECF 43-5, p. 10).
6. Report dated January 26, 2017, from ir.telkonet.com, with statement dated January 19, 2017:  "Telkonet Launches EcoSmart VRF Controller, Maximizes Energy Efficiency for Multi-Room Buildings," and 2016 Q3 results. (ECF 43-5, pp. 11-13).
7. Report dated January 26, 2017 from cannabisscience.com, with a "corporate overview" of Cannabis Science, Inc., stating its products are medical cannabinoid formulations, used to treat cancer and neurobehavioral disorders. (ECF 43-5, pp. 14-18).
8. Report dated January 26, 2017, from medicalmarijuana.com, with stock information, and a letter from the CEO, noting that the company was established in 2009, with a goal to deliver high-quality, health-focused cannabinoid oil products /hemp to families all over the world. (ECF 43-5, pp. 19-21).

**C.    Issues related to stock trading information received by inmates**

In late 2014, Zent paid for a subscription to the Wall Street Journal for Bitzan, which he received at ISP.  Bitzan submitted a copy of a December 30, 2014 issue of the Wall Street Journal with a mailing label to him affixed, addressed to him at ISP. (ECF

43-5-24).

The Plaintiffs submitted a copy of an article published in 2015 about an inmate in a San Quentin, California prison, who serves as an "informal" financial advisor to fellow inmates and correctional officers. The article reports that he offers a class within the prison, with outside professionals, teaching financial management in a group called Freeman Capital. The article reports that this inmate relies upon newspapers, and calls to family to check stock prices, and he directs them to make purchases of specific stocks. The article does not disclose who owns the stock or is able to complete the trades. (ECF 43-5 pp. 29-32).

Bitzan appealed a Notice of Rejection of mail from Zent, that included a W9 form on September 20, 2016. In October 2016, Bitzan advised Bowker that he needed to update his information with National Financial Services, LLC, with a W9 form, so that the company can report assets to the IRS. Bowker asked Bitzan what account this might be in reference to, and Bitzen stated that it related to "properly file taxes and report assets to the government." (ECF 43-6, p.7). The record is silent as to what the response was in relation to Bitzan's appeal, or this exchange between Bitzan and Bowker.

On January 6, 2017, Bitzan directed the Accounting Office of ISP to send a check for $500 to National Financial Services, % Heartland Investment Associates, in Hiawatha, IA, and the check was sent (ECF 43-5, p. 35). This check was returned to him by Edward Luebe, Executive Vice President/CFO, with a letter noting that they would not open an account for him, because he could not be contacted by telephone. In this letter of January 10, 2017, Mr. Luebe stated: "I do currently work with another person at Ft. Madison, but it was an account that I inherited from another representative." Plaintiffs do not identify what type of investment account may be held by another inmate at ISP, if that is the account Luebe is referencing, or whether this inmate has the Warden's permission to have such an account. (ECF 43-5, p. 34).

Plaintiffs submitted an affidavit from ISP inmate Gary Buck, who states that in

2000-2002, while he was an inmate at ISP he invested in a Van Kampen mutual fund. He stated that he sold his interest in the fund, and no longer invests.  He does not provide any information about other inmates who have been allowed to invest recently. (ECF 43-3, p. 16).

**D.      Issues related to discussions between Bitzan and ISP staff on investing in stocks**

On February 7, 2017, Bowker placed a "Generic Note" in Bitzan's ISP file, providing him with a copy, for the purpose of notifying him that he should cease all attempts to purchase securities or pursue other forms of investment, as that is against ISP rules. She cited AD FM 11 (not part of the record) for authority that "an offender is allowed a savings account only." (ECF 43-6. P. 5).

Between September 9, 2016 and February 7, 2017, Bitzan and Bowker exchanged messages through ISP's O-mail system.  Bitzan wanted a response from someone other than Bowker on: 1) the issue of attempts to purchase securities; 2) the status of his appeals; and 3) his complaint that Bowker was retaliating against him due to his prior lawsuits, her status as a Defendant in this case, and his attempt to amend the Complaint in the instant action to include his attempts to secure information for stock purchases.

In an O-mail message to the Warden on February 3, 2017, Bitzan stated that he wants to know the basis for the policy that prohibits him from purchasing stocks/bonds/annuities, inquiring as to whether the Warden is opposed to "inmates being responsible, learning and expanding their knowledge and skills to greatly assist them in life or their release from prison by saving money in stocks and bonds either through an investor or directly."

**E.      Other instances of alleged interference with Zent's mail sent to Bitzan**

The additional issues relating to Zent's mail to Bitzen are raised in the Amended Complaint:

1.      Denial of copy of the book, The Rights of Prisoners, 4th Ed., Vol. 2, ordered at a cost of $75.00, by Zent for Bitzen through Amazon.com on February 28, 2014.

However, as the order was not placed with the publisher, a used copy from a third-party vendor was sent. Because it was not shipped from the publisher, ISP would not allow it to be delivered to Bitzan. It was not returned to Zent. Zent also asserts that as a result of ISP denying delivery of this book, she spent money to copy pages from it, and sent copies of this material to Bitzan, who did receive these copies. Neither party provided a copy of a Notice of Rejection of Correspondence relating to this book. In the Amended Complaint (ECF 8 at &7), Zent asserts that she purchased the four volume set of this publication directly from the publisher at a cost of $602; this was delivered to Bitzan in March 2014.

2. Loss or failure to deliver Spanish: Stage 1 and Stage 2 Collins Easy Learning Audio Course, contained on books and CDs, which Zent purchased for Bitzan on Amazon.com on February 5, 2016. (ECF 43-6, pp. 24-25). According to Zent, Bitzan received a Notice of Rejection of Correspondence, which he appealed. There are no copies of this Notice in the record. On May 6, 2016, Zent asked Defendant Bowker by email to investigate why Bitzan was not allowed to have this material, as he was allowed to have music CDs. Zent said that ISP retained the books and CDs while they considered the appeal, and that Bitzan asked for the material to be returned to her, so she could get a refund. Zent states that she could no longer return the material, as too much time had passed since the purchase date. Bowker responded that she would look into this issue. The record is silent as to whether there was a resolution of this issue.

3. Rejection of 45 pages of photocopies of baseball cards, sent by Zent to Bitzen , which were received by the prison on April 29, 2016. Bitzen received a Notice of Rejection of this Correspondence on May 3, 2016, with the reason for rejection stated as based upon security concerns (ECF 43-6, pp. 26-27). Neither party provided a copy of the Notice of Rejection of Correspondence for this item.

On May 6, 2016, Zent wrote to Bowker, stating that she was providing copies of these cards to Bitzan for his opinion as to their value, or "other information I need." On May 9, 2016, Bowker, in response to Zent's inquiry as to why this material was rejected, stated that trading cards are not allowed due to security concerns regarding bartering for items and trading items amongst inmates, and that she assumed that is why copies were denied. Zent asserted that there was no legitimate government interest in restricting inmate's possession of actual trading cards, or copies of trading cards.

## F.   Relevant IDOC and ISP policies and regulations

The following IDOC regulations apply to inmates residing at ISP. Plaintiffs allege

that Defendants Baldwin and Bartruff, as Directors of IDOC, are responsible for violations of their First Amendment rights, as they have approved of these policies.

In their discussions with Bitzan regarding rejection of correspondence, Defendants referenced Policy AD-FM-11 but did not provide a copy for the record. In the Amended Complaint, Plaintiffs challenge IDOC Policy OP-MTV-02 but no copy of this policy was provided for the record.

Copies of the following policies were provided by Defendants as attachments to Exhibit C, Warden Ludwick's affidavit; the specific sections of these policies that applicable to Plaintiffs' claims are:

1.   IDOC Policy OP-MTV-01: Mail, Telephone and Visiting (ECF 32-3, pp. 9-18). This policy provides that non-confidential mail may be read. It also prohibits correspondence that includes social security numbers or bank account numbers of a third person. It notes that misuse of the mail may result in discipline. It requires that all incoming mail must be sent directly from the person who writes the correspondence.

2.   IDOC Policy IO-RD-03: Major Discipline Reports and Procedures (ECF 32-3, pp. 19-73). This policy describes actions that can result in disciplinary reports. It defines a security issue as any act that has the potential to cause significant disruption to the operation of the institution, affect the peace and tranquility of the institution or creates a danger to the public, staff or others. The rules are listed by number; major infractions include violations of the following rules:

    16: Unauthorized Possession/Exchange, Contraband, including when an offender possesses forms of securities, bonds, coins, currency, legal tender, official papers, or documents.

    33: Bartering, selling goods and services: offender is in violation of laws, rules, or policies regarding transfer or ownership of property; or offender agrees to perform or receives services, including legal work, for anything of value or in return for services.

    34: Entering into Contracts/Agreements, Operating Businesses: offender enters into a contract, unauthorized agreement, or engages in a business without the prior written approval of the Warden/Superintendent.

    40: Misuse of O-Mail, telephone or other communications: offender fails to follow institutional procedures or regulations or instructions (written or verbal), or includes coded messages or symbols in any communication.

    43: Attempt/complicity: offender attempts any disciplinary offense or is

complicit with others who are committing or attempting to commit any rule violation.

3. IDOC Policy IO-OR-07: Offender Businesses: offenders are not permitted to enter into a contract/agreement, incur indebtedness, or start or engage in a business or profession. (ECF 32-3, pp. 74-75).

In Warden Ludwick's affidavit submitted in support of the Motion for Summary Judgment (ECF 32-3, pp. 6-8) he states that these rules exist and are enforced to maintain the safety, security and orderly operation of the prison. The Warden states that allowing inmates to conduct businesses, hold securities, or trade stock is prohibited due to security concerns, the inability to adequately supervise inmates if they were to be able to exercise control over financial accounts or instruments, concerns regarding other inmates' involvement with a business operation, or the ability of financial instruments or anything that could be used to barter to interfere with prison operations. The Warden notes that prisoners are expected to follow the institutional schedule, including attending work or treatment programming, or maintaining their housing status. Ludwick noted that restrictions on inmate financial accounts are in place to protect the public, including having funds for restitution payments an inmate may be required to make, and that the policies prohibit accounts other than a savings account at ISP. Ludwick expressed the opinion that any discussion of marijuana distribution by inmates, or correspondence on this topic, was counterproductive to the goals of the institution relating to security and order, as many inmates are serving sentences for marijuana distribution, and it would be disruptive to have material about marijuana manufacturing or distribution in Iowa, where that is not a legal occupation.

## IV.  DISCUSSION

While Defendants' prohibitions potentially implicate Zent's First Amendment rights, "the person with the primary stake in the deprivations caused by imprisonment is the prisoner himself, and he rather than his relative is the proper party to complain about those deprivations." *Mayo v. Lane*, 867 F.2d 374, 376 (7th Cir. 1989). The Court in *Navin v.*

18

*Iowa Dep't of Corr.*, 843 F. Supp. 500, 503-04 (N.D. Iowa 1994), considered whether an inmate and his daughter could bring suit against prison officials after they refused to allow visits. The Court ruled that "[a]lthough the court is disturbed by the adverse effects [the inmate] has alleged are being suffered by his daughter, the claims brought here on behalf of both [the daughter] and [the inmate] may properly be brought only by [the inmate]." *Id.* (relying on *Mayo*). Even if Zent's interest is the same as Bitzan's, however, Defendants are entitled to summary judgment.

## A.    Mail

Prison regulations that impinge on an inmate's First Amendment rights must be "reasonably related to legitimate penological interests" based on the four factors set out in *Turner v. Safley*, 482 U.S.78, 89 (1987). Because *Turner* applies to incoming and outgoing mail, Zent's mail to Bitzan must comply with the same prison regulations; restrictions on her mail are not subject to lesser scrutiny. *See Yang v. Miss. Dep't of Corr.*, 833 F.3d 890, 894 (8th Cir. 2016) (applying the *Turner* test to incoming and outgoing inmate mail) (citing *Ortiz v. Fort Dodge Correctional Facility*, 368 F.3d 1024, 1026 & n.2 (8th Cir. 2004)).  Applying *Turner*, the record in this case demonstrates there is a valid, rational relationship between IDOC policies restricting incoming and outgoing mail, along with prohibitions on inmates' conducting businesses transactions, making contracts or holding financial accounts outside of the prison, and the governmental interest in security and order in prison, the Court has applied the four factors of the Turner test. Bitzan, as an inmate, has alternatives such as placing his business interests in the hands of others while he is serving his sentence. There is no way that the institution staff can oversee his management of a stock investment portfolio. The fact that another prison, in a state 2,000 miles away offers inmates this opportunity does not provide the basis for finding that this activity by inmates in Iowa does not pose a security risk to the institution.  It is the Warden's opinion that discussion within ISP of medical marijuana, companies that legally distribute marijuana, or research into medical applications for cannabis, would interfere

with the order and security of ISP might be disruptive, interfere with treatment, or provide security risks. It is not the court's job to substitute its opinion for reasonable decisions of the Warden on issues relating to security or institution order. Defendants are entitled to judgment as a matter of law on the First Amendment claims.

## B.  Due process

As for the due process claim, inmates have an interest, grounded in the First Amendment, to uncensored communication by mail, and when a prison official censors or withholds delivery of an inmate's mail, the prison must provide the inmate with notice of the rejection of the letter, opportunity to protest the action, and opportunity to appeal the decision to a prison official who was not involved in the censorship decision. *Procunier v. Martinez*, 416 U.S. 396, 418–19. (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Bonner v. Outlaw*, 552 F.3d 673, 680 (8th Cir. 2009) (recognizing "inmates have a due process right to notice whenever correspondence addressed to them is rejected"); *Murphy v. Missouri Dept. of Corrections*, 814 F.2d 1252, 1257–58 (8th Cir. 1987). The notice of rejection of Bitzan's incoming mail on a form indicating it "contained cannabis," was not clear that the basis for the rejection was not that it contained actual cannabis, but that it contained references to the legal manufacture and distribution of marijuana. However, in the context of all of the communications between Bitzan and ISP staff, including defendants, it was clear at the time that the basis for rejection of Zent's mail containing photocopies of information about companies, some of which describe medical marijuana research or distribution was that this information related to Bitzan's attempts to purchase stocks either directly, or through his mother. The prison regulations are very clear that inmates cannot maintain businesses or enter into contracts, or incur debt without permission of the Warden. Both Plaintiffs disagree with the need for such regulations, but they understood they were in violation of the institutional rules. They were afforded adequate due process in the rejection of outgoing and incoming mail relating to investment in companies.  Defendants are entitled to summary judgment on the due

process claim.

## C.   Retaliation

Defendants are also entitled to summary judgment on the retaliation claim. The adverse action taken in retaliation must "chill a person of ordinary firmness from continuing in the activity." *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013). Although causation in a claim of retaliation is usually a question of fact for the jury, there is no direct or indirect evidence in the record from which a reasonable jury could find a causal connection between the protected activity and the officials' adverse action. *See Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014); *Meuir v. Green Cty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) (elements for prima facie retaliation case include: exercise of constitutionally protected right, discipline, and exercise of the right motivated the discipline). Bitzan and Zent claim that following rejection of mail relating to companies for stock investments, Bitzan was threatened with disciplinary reports. He was, but these were cautions about his future activity in persisting to make attempts to invest, either directly or through his mother, and were based upon prison officials' justifiable interpretation of the rules prohibiting conducting businesses, entering into contracts and incurring debt. Additionally, after nearly 20 kites and other communications to staff while his appeal of rejection of outgoing mail was pending, officers advised Bitzan to stop sending interrogatories in relation to the appeal, as those were not allowed, and were considered a misuse of the prison mail, another rule violation. Bitzan was never given a disciplinary report following either caution. There is no evidence that supports his claim of retaliation. Assuming she has standing, Zent's claim of retaliation is based upon failure to return a Spanish language CD and book set, after it was rejected, and failure to deliver copies of sport trading cards, along with refusal to allow delivery of a book from a source other than the publisher. The prison's reason for rejecting the copies of trading cards and book are reasonably related to legitimate penological interests of security and safety. It is not clear from the record why the Spanish CDs and books were not delivered to Bitzan,

or not returned to the publisher or Zent.  Based upon this record, this instance of rejected mail is not sufficient to establish retaliation against Zent for her exercise of First Amendment rights in communication with Bitzan about stocks.

### D.    Defendants' other arguments

Because Defendants are entitled to summary judgment on the merits of Plaintiff's claims, they are also entitled to qualified immunity on his claims. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (qualified immunity protects prison officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").  Turning to the requested relief, although Zent is not subject to the restrictions in 42 U.S.C. § 1997e(e), but she is not entitled to damages as there was no violation of her constitutional rights.  Bitzan's claim for compensatory damages is barred by § 1997e(e) because he makes no prior showing of physical injury.  Contrary to Bitzan's suggestion, incarceration is not a physical injury but rather it is a prerequisite to the application of § 1997e(e).  Because Defendants are entitled to summary judgment, it is unnecessary to address Defendants' remaining arguments.

## IV.    RULINGS

Defendants' motion for summary judgment is **granted** (Dkt. #32). This case is dismissed with prejudice.

**IT IS SO ORDERED**.

**DATED** this 31st day of May, 2017.

JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA